### HELLER v. UNITED STATES.
#### No. 4701.

Circuit Court of Appeals, Seventh Circuit.
April 6, 1932.

Rehearing Denied May 3, 1932.

EVANS, Circuit Judge, dissenting in part.

Giles F. Clark and Oscar M. Nebel, both of Milwaukee, Wis., for appellant.

L. H. Bancroft, of Milwaukee, Wis., for the United States.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Heller alone appeals from a judgment of conviction against Cohen, Craney, and himself, charging them in four counts with (1) manufacturing liquor, (2) possessing it, (3) maintaining a common nuisance, and (4) possessing certain property designed for use in the manufacture of intoxicating liquor, all in contravention of the National Prohibition Law (27 USCA).

The assigned error mainly relied on is in the court's denial of the motion to suppress evidence seized by the government on search without warrant of Heller's residence and his store. On hearing of this motion evidence was given of these facts:

The prohibition agents had received information respecting a certain automobile which had been carrying packing cases marked with a fictitious name and a fictitious address, and had learned that Cohen had previously been arrested while driving an automobile having therein some boxes so labeled, and also carrying whisky. On the morning of December 29, 1930, the agents went to Heller's store, conversed with him, and there found some of the boxes so labeled. They drove thence to Heller's home, and in its driveway there was a car having the license number whereof they had been notified. Craney and Cohen were taking from the car, and into the basement of the house, boxes having the same label. The door leading into the house and thence to the basement entrance was open, being so held by the close proximity of the car. Cohen came up from the basement and was asked whether he lived there, to which he answered, "No"; and when asked, "Where is the boss?" he said, "In the basement."

Looking through a window the agents saw in the basement twenty or twenty-five five-gallon glass bottles along the wall. Some of the bottles were full of brown colored liquid, and the others appeared empty. They saw a large number of boxes, some of which bore the same fictitious label, "S. B. Paper Co., 2019 Vliet St.," and also a filtering machine. The agents testified that what they observed from the window was similar to equipment in "cutting" plants. These are plants wherein alcohol is "cut" or modified and colored and flavored to resemble whisky, and then bottled and labeled. Before they entered there came very noticeably from the basement and through the hallway door fumes of alcohol. The agents then went through the open door, and on reaching the foot of the basement stairs a fully equipped cutting plant was visible. On the laundry tubs were boards upon which stood twelve five-gallon bottles of whisky. The boxes, labeled as stated, contained whisky labels and fictitious strip stamps.

On the hearing of the motion to suppress, Heller himself testified he was there running a cutting plant. This is "manufacturing" in contravention of the law. Danovitz v. United States, 281 U. S. 389, 396, 50 S. Ct. 344, 74 L. Ed. 923.

It seems plain enough that what the agents saw through the basement window before they entered the building, in conjunction with the odor coming to them at the same time from the basement, was all-sufficient indication to them that the law was being violated, in that articles especially adapted and designed for the manufacture of intoxicating liquor intended for use in violating the law were possessed within that basement. Palazini v. United States (C. C. A.) 14 F.(2d)

886; Klein v. United States (C. C. A.) 14 F.(2d) 35. These facts are further evidence that the articles were then in actual use for the purpose of manufacturing liquor contrary to the statute, and so it is that before entering the building the agents became aware that in their presence a crime was then actually in course of commission. This justified their entrance into the basement through the open door and their search of the basement, and the arrest of the persons there found in actual charge of these concededly unlawful operations. Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409.

The above recited facts, adduced on the hearing of the motion to suppress, justified the denial of the motion.

Heller, who resided upon the premises, was not present while the agents were there. The agents took from Cohen and the other man whom they arrested a key to a side entrance to Heller's store, and they then went to the store, which was locked, and opened the side door with the key. Going into the store they found and seized more bogus stamps, labels, and paraphernalia for carrying on such unlawful traffic, also a small quantity of whisky.

■ The evidence sufficiently showed that the unlawful operations were carried on in the store as well as in the basement of the residence—not as separate units, but as parts of the same business. Cohen was active in both places, and carried the key to the store. Upon the lawful search of him the key was taken, and in the indicated circumstances there was no impropriety on the part of the agents in employing the key to enter the store wherein the agents had previously seen the same suspicious boxes which bore the same fictitious labels, and where they had conversed with Heller, in whose residence they had just found the unlawful cutting plant.

The holding in the Agnello Case, supra, that the entry of Agnello's residence without warrant was unlawful, was upon facts quite different from those here. The only asserted justification for entering the residence was that Agnello had been arrested with others whom the agents said they saw in possession of narcotic packages in another building. There was not, as here, any reason to believe there existed any relation between the two places. Indeed, Agnello testified denying he knew what was in the packages found in the place where he was arrested.

But if the search of the store were conceded to be unlawful, the evidence thereby obtained was not harmfully consequential to appellant, considering what was discovered at the house. As to the latter, there was no question or contradiction and, once the evidence of what there occurred was admitted, there was no possible escape from conviction.

■ Heller complains of the admission against him on the trial of the evidence he gave on the hearing of the motion, to the effect that the house which was searched was his residence. This evidence was offered by the government for the purpose of showing Heller's relation to the house, since nothing had theretofore appeared on the trial to indicate his connection with it. It is contended for Heller that evidence he gave upon the hearing of the motion to suppress cannot thereafter be used on the trial for any purpose.

If Heller had made such a statement out of court, it undoubtedly could have been shown upon the trial, by testimony of those who heard him make it, in any undertaking by the government to show his relation to the place where the crime was charged to have been committed. We cannot see why this should be less so if the statement he had made was in court and under the solemnity of an oath. He was not obliged to testify upon the motion any more than upon the trial. Had he testified at the trial denying it was his residence, the testimony he previously gave to the contrary might have been used for his impeachment. If there were a second trial of the same case, any admissions he made as a witness upon the first trial could be shown against him on the second, although on the second he did not testify.

Having voluntarily become a witness upon one issue in the case, what he there testified may thereafter be shown against him upon trial of any other issue therein. This was held in principle, but upon somewhat differing facts, in Raffel v. United States, 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054, and Powers v. United States, 223 U. S. 303, 32 S. Ct. 281, 56 L. Ed. 448; and upon like facts in Vaught v. United States, 7 F.(2d) 370 (C. C. A. 9), and United States v. Lindsly, 7 F.(2d) 247 (D. C. La.). We find in this no invasion of appellant's constitutional immunity against compulsory self-incrimination.

The judgment is affirmed.

EVANS, Circuit Judge.

I cannot bring myself to subscribe to certain views expressed in the majority opinion to the effect that statements made by an

accused in support of his application to recover property seized and taken from him, pursuant to an unlawful search by federal officers, may be used against him on the trial of the criminal case instituted as a result of such unlawful search and seizure. Although there are authorities sustaining this position [Vaught v. U. S. (C. C. A.) 7 F.(2d) 370; U. S. v. Lindsly (D. C.) 7 F.(2d) 247], it seems to me that such statements should be excluded on the trial of the criminal action, under certain circumstances at least, so as to give effect to the Fourth Amendment, as that amendment has been construed, sustained, and enforced by the Supreme Court in Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Gouled v. U. S., 255 U. S. 298, 306, 41 S. Ct. 261, 65 L. Ed. 647.

No uncertainty exists as to the soundness of the proposition that incriminating evidence unlawfully seized by federal prohibition officers, pursuant to an unlawful search, may not be used, over proper objections timely made, to secure a conviction of the person from whom the incriminating property has been unlawfully taken. Weeks v. U. S., supra.

It is equally clear, however, that the accused's right to exclude such evidence is dependent upon his proceeding before trial to have such evidence suppressed and returned to him. Segurola v. U. S., 275 U. S. 106, 48 S. Ct. 77, 72 L. Ed. 186.

It was, therefore, necessary for the appellant in this case, in order to protect himself against the use of evidence which he asserts was unlawfully obtained, to make application for a return of the property unlawfully seized. The necessity of applying for the return of the property carried with it the burden of supporting the allegations of his petition by testimony showing the search and the seizure were unlawful. The evidence thus given to support such petition is received for no other reason than to protect a constitutional right granted the accused by the Fourth Amendment. If such testimony can only come from the lips of the accused, then his testimony, as well as his petition, should not be used against him.

Protection of the citizen's right against invasion by unlawful seizure following unlawful search is only possible through rulings which prevent, both theoretically *and* practically, the violation of the Fourth Amendment. To illustrate: If the home of the accused were the subject of an unlawful search, and property were seized by the federal officers making such search, the accused would be clearly within his rights in making application for the return of the property improperly seized. To return to him the property thus seized, yet permit the government to use the evidence by him given (there being no other evidence available) to secure a return of this property, would result in the government's doing indirectly what it could not do directly. A more effective avoidance of the Fourth Amendment could hardly be conceived.

In the case of Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 344, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, the court, speaking of the practical question involved, said: "If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution."

In Gouled v. United States, 255 U. S. 298, 304, 41 S. Ct. 261, 263, 65 L. Ed. 647, the court said: "It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers."

We are not, at the present moment, interested in the logic of these holdings. It is our duty to follow them. Under these decisions the impropriety of using evidence secured in violation of the Fourth Amendment is not debatable. Evidence unlawfully obtained by federal officials in violation of the accused's right under the Fourth Amendment *may not be used* to secure the accused's conviction against his objection, timely made. Accepting this proposition as our major premise, it necessarily follows as a corollary that evidence given by the accused to sustain his objection, there being no evidence but that of the accused to establish the unlawful search and seizure, must also be incompetent. In fact, its exclusion is but another application of the Weeks and Gouled decisions.

In the instant case, the evidence, aside from the accused's statement made when seeking a return of his liquor, clearly and conclusively established his guilt. The ruling on the admission of this evidence was not

therefore prejudicial. The question raised by such ruling, however, is so important that I felt justified in expressing my views respecting the proper limitation to be placed upon the use of such evidence.